IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
FIRST JUDICIAL DISTRICT AT JUNEAU

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES,<br><br>Plaintiff,<br><br>v.<br><br>CARLANNA CONSTRUCTION, INC., and the CITY OF KETCHIKAN<br><br>Defendants.<br><br>3.15 acres, more or less (approximately 137,181 square feet) | ) ) ) ) ) ) ) ) ) ) Project No.: SFHW 000085 ) Project Name: KTN Revilla New ) Ferry Berth & Upland Improvements ) U.S. Survey No.: 1083 ) Parcel: 2 ) )    Case No. 1JU-19-00943 Civil ) |

## MASTER'S REPORT (COVER SHEET)

The Report of the Master in the above action is attached for filing in accordance with the Court's order.

***Directions To Clerk:  Pursuant to Civil Rule 72(h)(3) and (4), the clerk of court shall promptly serve the report on all parties who have answered or appeared.***

I certify that on <u>June 17, 2022,</u>
a copy of this report was sent to:
J. O'Connell, E. Hickey, C. Cacciola, M. Seaver

Clerk:  ___eaffatato___ .

Exhibit A
Page 1 of 32
CIV-680 (11/95)(cs)                                                    Civil Rule 72(h)(3) & (4)
MASTER REPORT COVER SHEET – CONDEMNATION
Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 1 of 32

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
FIRST JUDICIAL DISTRICT AT JUNEAU

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, | ) ) ) ) | Filed in the Trial Courts<br>STATE OF ALASKA, FIRST DISTRICT<br>AT JUNEAU<br>**JUN 1 3 2022**<br>By_____Deputy |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CARLANNA CONSTRUCTION, INC., and the CITY OF KETCHIKAN | ) ) ) ) | Project No.: SFHW 000085 Project Name: KTN Revilla New Ferry Berth & Upland Improvements |
| Defendants. | ) ) | U.S. Survey No.: 1083 Parcel: 2 |
| 3.15 acres, more or less (approximately 137,181 square feet) | ) ) ) | Case No. 1JU-19-00943 Civil |

**FORM OF REPORT OF MASTER**

The undersigned, having been appointed and sworn as Master in the above-captioned case to ascertain and assess the amount to be paid by the plaintiff, State of Alaska, Department of Transportation and Public Facilities ("DOT&PF") to defendant Carlanna Construction Inc., ("Carlanna"), as just compensation for condemnation in the State's Declaration of Taking dated November 1, 2019, held a hearing on starting on May 9, 2022 and ending May 11, 2022.

DOT&RF was represented by Ms. Jordon O'Connell and Mr. Gene Hickey. Carlanna was represented by Mr. Charles Cacciola.

1

Upon hearing the evidence and being otherwise fully advised, it is my finding as Master that the just compensation to which Carlanna is entitled for the State's taking in this case, as of November 6, 2019 is as follows:

**JUST COMPENSATION**

1. The fair market value of the interest in the land taken is $2,415,000.

2. The undisputed value of the improvements, a fence, is $45,000

3. The total just compensation is $2,460,000

Dated June 10, 2022

_____
Judge Sen Tan, Special Master

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
FIRST JUDICIAL DISTRICT AT JUNEAU

Filed in the Trial Courts
STATE OF ALASKA, FIRST DISTRICT
AT JUNEAU

JUN 1 3 2022

By_____Deputy

STATE OF ALASKA, DEPARTMENT OF )
TRANSPORTATION AND PUBLIC )
FACILITIES, )
                )
       Plaintiff, )
                )
v. )
                )
CARLANNA CONSTRUCTION, INC., )
and the CITY OF KETCHIKAN, )
                )     Case No. 1JU-19-00943- CI
       Defendants. )
                )

Revilla Airport Shuttle Ferry
Upland Improvements
Project No. SFHWY00085
Parcel 2 -137,214 square feet (3.15 acres)

## MASTER'S REPORT

### INTRODUCTION

Pursuant to Alaska Civil Rule 72(h)(3), the undersigned was appointed master to determine the amount of just compensation for 3.15 acres of waterfront property taken as part of the Ketchikan Gravina Access project.

After consideration of all the evidence submitted, Carlanna Construction, Inc. ("Carlanna"), is entitled to just compensation from the State of Alaska, Department of Transportation & Public Facilities ("DOT&PF") in the amount of $2,460,000. The fair market value of the interest in the land taken is $2,415,000 and the value of the improvements, a fence, is $45,000.

Exhibit A
Page 4 of 32

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 4 of 32

## FINDINGS OF FACT

1.     This is an eminent domain dispute. A hearing was held on May 9, 10, and 11, 2022. Seven witnesses testified. Three were percipient witnesses, Gregory Weinert, DOT&PF Southcoast Region Right of Way Chief, Bill Elberson, a real estate broker, and Howard Arntzen, the sole shareholder of Carlanna. The four expert witnesses were appraiser Charles Horan, retained by DOT&PF, and appraiser Kim Wold, retained by Carlanna, who testified about their appraisals of the Property. Appraiser Per Bjorn-Roli was retained to review Mr. Horan's appraisal and to provide his independent opinion of value. Lastly, Lydia Larson was engaged to critique of Mr. Bjorn-Roli's report. She did not perform a separate appraisal of the property.

2.     After the hearing, the parties filed proposed Findings of Facts and Conclusions of Law to serve as their closing arguments on May 23, 2022.

3.     The outcome of this dispute rests primarily on the testimony and opinions of the three expert witnesses who arrived at substantially different appraisal values. The parties stipulated that this class of testimony involving special knowledge, skill, and experience is proper and competent evidence, but the weight and credibility of the testimony is left solely to this tribunal.[1] The parties also stipulated to the qualification of all the expert witnesses.

4.     Evaluation of the Property is not easy, as there are few comparable sales of waterfront property in Ketchikan or similar property transactions in Southeast Alaska. The transactions that exist may not be close to the time of valuation,

---

[1] Instruction No. 10.

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 5 of 32

and are rarely clean, undeveloped parcels of land sold without significant other components to the transaction. In almost all cases, adjustments have had to be made to come up with a comparable sale. The differences in the appraisal values reflect the judgment of the three experts in determining the highest and best use of the property, selecting comparable sales (including sales in Juneau), and the effect of project influence on the value of the Property.

### Background and Relevant Information

5.      Mr. Arntzen owns Carlanna Construction Inc. Carlanna received the Property in a stock redemption and reorganization transaction with Mr. Arntzen's father's company in 1992. The Property was available for sale from the early 1990s onwards. Mr. Arntzen discussed it with real estate agents and other market participants for many years until the property was listed for sale.

6.      Around 2013, real estate agent Mr. Elberson was retained to list three of Mr. Arntzen's commercial properties. He listed the Property for $4,000,000 in 2013 and five parties expressed interest but no firm offers were received. The other two commercial/industrial properties sold for below the listing price.

7.      In November 2015, the listing price was increased to $5,615,000 based on Mr. Wold's 2010 appraisal. There were no further inquiries or offers after the price increase. Mr. Arntzen testified he was not eager to sell the Property. Mr. Elberson understood that the price was increased because Mr. Arntzen's other properties had sold, so the pressure was off.

8.      The Gravina Access Project was initiated in the early 2000s to improve access between Revillagigedo Island where the Ketchikan Gateway Borough and

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 6 of 32

the City of Ketchikan are located to Gravina Island, where the Ketchikan International Airport is located.

9.      In July 2004, the Final Environmental Impact Statement("FEIS") was issued which identified six bridge alternatives and three ferry alternatives. Bridge alternative F1 was identified by the Federal Highway Administration ("FHWA") and the DOT&PF as the preferred alternative.

10.     In September 2007, then-Governor Palin announced that the State could not fund the selected bridge alternative identified in the Gravina Access Project. It was euphemistically called "The Bridge to Nowhere"

11.     In 2008 the FHWA and DOT&PF initiated development of a Supplemental Environmental Impact Statement ("SEIS") for the project by reassessing the nine reasonable alternative plans evaluated in 2004 and added six new alternative plans, bringing the total number of choices up to 15.

12.     Soon thereafter in 2009, the 15 alternatives, which included both bridge and ferry alternatives, underwent a screening process. Through a draft report and public comment period in 2013, the alternatives were narrowed down to six.

13.     This effort culminated in October 22, 2015 when DOT&PF identified Alternative G4v as the preferred alternative. Alternative G4v would improve existing ferry facilities for airport travelers and the movement of heavy freight.

14.     On June 15, 2017, the FHWA and DOT&PF signed the Final SEIS and Record of Decision confirming Alternative G4v as the Gravina Access project.

15.     As stated in Instruction No. 4, "On November 6, 2019, fee title in Parcel 2 vested in DOT&PF . . . that the land was taken by DOT&PF for public use, and there is no dispute on this issue."

## Issues Presented

16.     In this dispute, three issues are presented:

(a) what is the highest and best use of the Property;

(b) what is the market value of the Property; and

(c) is there project influence that has affected the market value of the property.

## Highest and Best Use

17.     Instruction No. 8 states the law on highest and best use.[2] In this case, the expert witnesses disagreed and came to very different conclusions. Mr. Horan opined that the highest and best use of the property was waterfront industrial. Mr. Bjorn-Roli concluded that the highest and best use of the Property was a cruise ship berth. Mr. Wold straddles both positions. In his expert report, and in all past appraisals from 2002 – 2021, he concluded that the highest and best use of the Property was waterfront commercial or industrial.

---

[2] Instruction No. 8 <u>Highest and Best Use.</u> Fair market value is based on the property's highest and best use. This is not necessarily its current use nor can it be based on wishful thinking, unrealized contingencies, speculation or conjecture. It is the highest and best use reasonably probable. The four criteria the highest and best use must meet are: a) legal permissibility; b) physical possibility; c) financial feasibility; and d) maximum productivity. You are instructed that you must base your decision upon the highest and best use to which the condemned property can legally, reasonably, and practicably be adapted, unless there is a reasonable probability that the law will change and the reasonable buyers and sellers would consider the probability of such a change in arriving at a price.

5

At the hearing, Mr. Wold abandoned his long-held view and stated that the highest and best use of the Property was a cruise ship berth.

18.     Appreciating the opinions of the experts require an understanding of the cruise ship berths that service Neo-Panamax or New Panamax ships. The cruise industry has been building very large ships that can to travel through the wider lane of the Panama Canal. These ships can be up to 1,200 feet in length. These are the type of cruise ships that have been carrying visitors to Southeast Alaska. Because of the length of the ship, the berth will need to provide 1,400 feet of waterfront in order to be able to tie up the ship. Also, these behemoths have a draft of up to 50 ft.

19.     Mr. Horan addressed highest and best use in his expert reports and in his testimony.[3] He described the Property as the largest vacant waterfront land within the Ketchikan City limits that has a heavy industrial zoning classification. He noted that the site is capable of accommodating uses such as development of a shipyard, marinas, float plane operations, fueling facilities, construction storage, barge landing, and other transportation uses. Mr. Horan also discussed the needs of the neighborhood and concluded that the highest and best use is for waterfront industrial.

---

[3] Mr. Horan authored the 2019 Horan Report as well as the 2021 Horan Report. The 2019 Horan Report, which preceded the date of take, is substantially the same as the 2021 Horan Report, authored after the taking, except in two respects. The substantial differences between the 2019 and 2021 reports are the dates of valuation (May 3, 2019 and November 6, 2019, respectively), and a change in the fourth comparable sale. The reference here is to Mr. Horan's 2021 report.

20.     Mr. Horan determined that a cruise ship berth was not the highest and best use after considering whether it was legally permissible, physically possible, financially feasible, and maximally productive. He interviewed Ethan Berto of Survey Point Holding Company (which developed Berth IV) who stated there was no perceived need for or discussion of a fifth cruise ship berth in Ketchikan, and Harbormaster Steve Corporon, who said the City was studying increasing capacity at the existing berths to meet new demand. Mr. Horan also reviewed the 2016 Moffat & Nichol Study which did not consider additional berths in or near Ketchikan at that time, and documents prepared by the Southeast Alaska Pilots Association ("SEAPA") which recommended mega ships not be maneuvered near the location of the Property. Based on this research and understanding of the cruise ship market, Mr. Horan testified that the Property was not a probable site for a cruise ship berth. Mr. Horan concludes that the highest and best use of the site would be industrial or commercial development consistent with the heavy industrial zoning ordinance.

21.     I find Mr. Horan's opinion of the highest and best use credible, as he applied the correct legal standard, that the use is legally permissible, physically possible, financially feasible, maximally productive, and supported by substantial evidence.

22.     Mr. Bjorn-Roli opined that the highest and best use of the Property was a cruise ship berth. The Property has 634 ft. of waterfront or tidelands. This by itself is inadequate to build a Neo-Panamax size cruise ship berth. To construct such an immense size berth would require the assemblage of adjoining tidelands

and possible portions of neighboring uplands. Mr. Bjorn-Roli did not adequately support assemblage because: (1) he did not address the cost or time required to acquire the tidelands; (2) he did not research ownership of the tidelands, or whether owners of the tidelands and neighboring properties would participate in the assemblage; and (3) he did not acknowledge the risk that assemblage would be unsuccessful. Mr. Bjorn-Roli did not discuss the Property with engineers or marine navigation experts, and he did not use any studies or reports that identify the Property as a potential cruise ship berth. Instead, he measured out the shape of a Neo-Panamax ship on an image from Google Earth and concluded that it would fit. He did not even physically visit the Property before writing his report. I find that Mr. Bjorn-Roli's opinion is speculative and is inadequate to support that a cruise ship berth is physically possible at the Property.

23.     Mr. Bjorn-Roli relied on even less in concluding that a cruise ship berth was financially feasible. Mr. Bjorn-Roli dealt with financial feasibility in just one sentence in his expert report. He stated that "financially feasible uses include industrial, commercial and cruise ship terminal."[4] In his testimony Mr. Bjorn-Roli explained that building a cruise ship berth was financially feasible because there was a market for Neo-Panamax berths in Ketchikan, as evidence by the Ward Cove two berth project, thus building a berth at the Property must be financially feasible. In coming to this conclusion, he assumed that cruise ship berths were fungible, rather than very complicated and complex financial projects. This is evidenced by the auction of the Alaska Mental Health Trust

---

[4] Bjorn-Roli Expert Report at P. 26

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 11 of 32

property in Juneau, where Norwegian Cruise Lines put in a very high winning bid, tied to its business model of gaining dominance in the cruise ship market in Alaska. That transaction was a business deal for Norwegian Cruise Lines, and not a real estate deal.[5] The same can be said for the building of Berth IV in Ketchikan, involving 1033 and 1039 Water Street (Waterfront Storage). This required assemblage of multiple parcels of property for the project.[6]

24.     Mr. Bjorn-Roli's conclusion that the Property would have been developed instead of Ward Cove is unsupported by the evidence. It has not been established that one Neo-Panamax cruise ship berth is physically possible at the Property. The Ward Cove site supports two berths, plus significant uplands for tourism amenities. Mr. Bjorn-Roli did not interview anyone in the cruise ship industry as part of his analysis, did not read any reports or studies identifying the subject as a potential berth location, and never discussed the subject with any cruise ship owners, operators, or developers. He also admitted he did not analyze

---

[5]  Mental Health Trust Subport Lot C1 is a roughly 3-acre waterfront property in downtown Juneau. Mr. Horan did an appraisal for the Alaska Mental Health Trust which was used to set the floor for a closed bid auction. The three high bids for the property ranged from $20 million to $12.8 million and were all submitted by cruise ship operators or other cruise ship industry members. The winning bidder was Norwegian Cruise Line("NCL") at $20 million. Mr. Horan testified this transaction does not reflect market value because NCL was not a typically motivated buyer. NCL needed to secure preferential docking rights for its new Neo-Panamax cruise ships in Juneau and understood this as the only opportunity to do so. NCL was aware other cruise ship developers were interested. NCL made a business decision to bid whatever it took to win. Mr. Horan testified he discussed this transaction with the decisionmaker at NCL who stated he did not consider it a market transaction. The MHT Subport Lot C1 transaction includes a significant premium over market value.

[6]  1033 & 1039 Water Street (Waterfront Storage) is a 78,934 sq. ft. waterfront property sold in June 2006 for $3,900,000. At the time of the purchase, the buyer had purchased neighboring parcels and negotiated an agreement with the City for a new berth that included the site. This property was a necessary part of the assemblage to build Berth IV, and Mr. Horan testified that the buyers paid a significant premium for the property. Mr. Bjorn-Roli testified that it was a very complex assemblage of properties for the cruise ship berth.

whether there were any potential berth sites in Ketchikan other than the Property and Ward Cove. Mr. Horan credibly testified that there are "at least a dozen" sites that would be equal to or better than the Property as a cruise ship berth, including sites in Ward Cove, Saxman, and near Peninsula Point.

25.     Lastly, Mr. Bjorn-Roli failed to support his conclusion that a cruise ship berth is maximally productive at the Property. His premise is that use of the Property for a cruise ship berth is more valuable than other uses, thus, such use is maximumly productive. Mr. Bjorn-Roli believes that a cruise ship berth has a market value of over $7,000,000.[7] This opinion suffers from the same deficits as Mr. Bjorn-Roli's other opinions as to physical possibility and financial feasibility. The Property by itself is insufficient and cannot be built into one cruise ship berth. Mr. Bjorn-Roli, other than mere speculation, has no factual evidence that assemblage of the adjoining tidelands and uplands is reasonably probable. In addition, the Property has been for sale since the 1990's and was listed in 2013 at $4,000,000 and although there were inquiries before the listing price was raised to over $5,000,000, there was no evidence that there was any plans or proposal to develop the property as a cruise ship berth. This hardly supports a projected market value of the property of over $7,000,000. Mr. Bjorn-Roli's opinion of highest and best use is "based on wishful thinking, unrealized contingencies, speculation [and] conjecture."[8]

---

[7] Problems with Mr. Bjorn-Roli's valuation methodology will be addressed in the section on market value.

[8] Instruction No. 8 Fair market value "cannot be based upon wishful thinking, unrealized contingencies, speculation or conjecture."

10

26.     In addition, this tribunal concludes that Mr. Bjorn-Roli's testimony lacks credibility and veracity.  Mr. Bjorn-Roli was also retained to review Mr. Horan's expert opinions where he pointed out "critical errors" made by Mr. Horan.  Mr. Horan's appraisals were performed in compliance with the Uniform Standards of Professional Appraisal Practice ("USPAP") and DOT&PF's appraisal guidelines in Chapter 4 of the State of Alaska Right of Way Manual. Mr. Bjorn-Roli's report identified Mr. Horan's failure to perform his appraisals in compliance with Uniform Appraisal Standards of Federal Land Acquisitions ("UASFLA") as a "critical error".   However, Mr. Bjorn-Roli conceded at the hearing that he was wrong, and that Mr. Horan was correct, that the USPAP applied and not the UASFLA.[9]

27.     Although there was adequate time to do so, since this was brought to his attention at his deposition, Mr. Bjorn-Roli did not amend his report to correct this error. His report consistently uses the UASFLA standards, and this error permeates his entire analysis.  At the hearing, Mr. Bjorn-Roli attempts to brush aside his error by essentially saying that it did not make much of a difference anyway. This retraction undermines his claim that Mr. Horan's use of the correct standard was a "critical error".   In sum, it is Mr. Bjorn-Roli who made the significant blunder, substantially damaging the credibility of his opinions.

28.     Mr. Wold is an employee at Reliant Advisory Services, LLC, where Mr. Bjorn-Roli is a partner.  Mr. Wold has over 40 years of professional appraisal

---

[9] It is interesting to note that Mr. Wold adhered to the USPAP standards in his expert report. Mr. Bjorn-Roli's critique of Mr. Horan's standard applies to Mr. Wold's report as well.

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 14 of 32

experience in Alaska. He lived in Ketchikan from 1974 to 1997, and continues to maintain a residence in Ketchikan. Over the years he has appraised around 60% of the commercial/industrial property in Ketchikan, and has consulted on numerous cruise ship dock projects in Southeast Alaska.

29. Mr. Wold has appraised the Property four different times, in 2002, 2010, 2019, and 2021, the latter two were written in connection with this proceeding. In each instance over two decades, he concluded that the highest and best use of the property was waterfront commercial or industrial development, until the hearing. Without an explanation, Mr. Wold testified that he had been wrong, and that the highest and best use of the Property was as a cruise ship berth. Given his 40 years of experience, it is hardly credible that Mr. Wold was mistaken and had somehow overlooked such a use for the Property since his 2010 appraisal states that commercial uses of the property would "include a small cruise ship terminal".[10] Mr. Wold had previously considered a small cruise ship terminal, just not one that would fit a Neo-Panamax size vessel. Mr. Wold did not do any of his own investigation or analysis and relied entirely on Mr. Bjorn-Roli's work to arrive at his newfound conclusion.

30. Mr. Wold wanted to keep his options open and has advanced two different market values for the Property. Mr. Wold testified that since he was mistaken as to the highest and best use, his appraisal of $4,870,000 does not represent market value. He concurs with Mr. Bjorn-Roli that the market value of the Property is $7,500,000. However, should this tribunal reject his newly adopted

---

[10] Wold 2010 Appraisal at P. 38.

12

highest and best use, then this tribunal should accept $4,870,000 as the accurate market value of the Property for waterfront commercial purposes. This flip-flop by Mr. Wold has severely damaged his credibility. Mr. Wold lacks the independence that is expected of an expert witness and is willing to take contradictory positions to satisfy either his superior in the partnership or his client.

## Market Value

31. Having concluded that the highest and best use of the Property is for industrial or commercial development, the next step is to determine the market value as of the date of the acquisition on November 6, 2019. "Fair Market Value is the price a willing, informed seller would accept from a willing, informed buyer on the open market."[11]

32. DOT&PF's market value requires examination of Mr. Horan's expert appraisal. Carlanna appears to advance multiple market values even disregarding the use of the Property as a ship berth. Carlanna advances three propositions. First, taking Mr. Wold's 2002 and 2010 appraisals, and applying an annual 3% inflation rate, results in $6,776,675 and $7,326,301 respectively, values bracketing $7,000,000. Second, Carlanna advocates that this tribunal adopt Mr. Wold's 2010 appraisal of $5,615,000 as the "fair market value, undistorted by the Gravina Access Project."[12] Third, Carlanna may still be

---

[11] Instruction No. 6.
[12] Carlanna's Proposed Report of Master at P. 15

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 16 of 32

advancing Mr. Wold's 2019 and 2021 appraisals, which Mr. Wold had previously disavowed as too low and counterfactual.[13]

33.    To arrive at the appraised market value requires consideration of comparable sales. "Sales are relevant if there is a similarity of the property sold to the land being condemned, a reasonable proximity in time of the sale to the date of valuation, and the sale is a bona fide and voluntary transaction with both the buyer and seller acting intelligently and neither acting under compulsion."[14]

34.    Once the relevant sales have been selected, the appraiser than makes quantitative and qualitative adjustments to the sale price to best approximate a meaningful comparison of the properties. "Ideally, quantitative adjustments are determined through paired sales analysis or other definitive data. However, when quantitative adjustments cannot be reliably ascertained, as is typically the case in Alaskan markets due to data limitations – qualitative adjustments may be applied through a weighted analysis of each comparable based on its relative merits."[15] "Comparables requiring a lower degree of gross adjustment are generally the most reliable indicators of value. Comparables requiring higher degrees of gross adjustment are generally less reliable indicators of value, but may still be meaningful and given weight if the adjustments made were strongly supported."[16] Lastly, qualitative adjustments require reasonable

---

[13] Carlanna's Proposed Report of Master p. 14-15.
[14] Instruction No. 9 – Comparable Sales
[15] Kim Wold 2021 Expert Report p.46.
[16] Kim Wold 2019 Expert Report p.55.

exercise of appraiser judgment and this is very much dependent on the expert's credibility.

35.    In ascertaining market value, Mr. Horan considered commercial real estate transactions over the past 10 years. He then selected the four most relevant comparable sales comprising of Ketchikan waterfront property transactions between 2011 and 2013. In making his qualitative adjustments, Mr. Horan looked at the price, and applying his judgment, determined whether the comparable sale was better or worse than the Property in some way to come up with a range of market values.[17] With that information, he came up with \$20/SF for uplands and \$5.00/SF for tidelands, or a fair market land value of the Property of \$2,414,386, rounded up to \$2,415,000.

36.    Horan Comp 1, 4100 Tongass Avenue, is a 41,670 sq. ft. waterfront property sold in May 2011 for \$462,000. Mr. Horan's allocation of \$16.00/SF for uplands and \$1.59/SF for tidelands was based on the uplands/tidelands ratio from an appraisal conducted for the buyer after the transaction. The tidelands are inferior to the Property and encumbered by the adjacent parcel's tidelands. Comp 1 is inferior due to its narrow shape and lack of direct deep-water access. This is a comparable sale and indicates the Property has an upland value of more than \$16.00/SF and a tidelands value of more than \$1.59/SF.

37.    Horan Comp 2, 4159 Tongass Avenue, is a 124,010 sq. ft. waterfront property sold in July 2013 for \$1,462,000. Mr. Horan valued the uplands at

---

[17] In contrast, Mr. Wold made qualitative adjustments by applying a percentage to the sale price, to derive an adjusted per square foot price. This will be addressed when Mr. Wold's comparables are discussed.

$17.18/SF and tidelands at $2.58/SF. This property and the property at 900 Stedman Street were purchased as part of the same larger transaction, which included the businesses located on the properties. The land values were based on the buyer's allocation of $2,700,000 to land for the two properties, which Mr. Horan then apportioned between the properties (and between uplands and tidelands) based on an appraisal of the properties that Mr. Wold performed for the seller. Comp 2 is slightly inferior to the Property due to the long, narrow tidelands. This comparison indicates the Property has an upland value of more than $17.18/SF and a tidelands value of more than $2.58/SF.

38.     Horan Comp 3, 900 Stedman Street, is a 1,557 sq. ft. waterfront property sold in July 2013 for $1,238,000. Mr. Horan valued the uplands at $20.22/SF and tidelands at $7.09/SF. This property was purchased in the same transaction as 4159 Tongass Avenue. The parcel is similar to the Property, but the compact, well-developed tidelands are superior. This sale indicates that the Property has an upland value of close to $20.22/SF and a tidelands value of less than $7.09/SF.

39.     Horan Comp 4, 900 Stedman Street, is approximately 8 acres of uplands and approximately 12 acres of tidelands in Ward Cove. The site is leased for an annual rent of $1.50/SF uplands and $0.60/SF tidelands; the rent is based on the lessor's rental rates for other industrial properties in Ward Cove. Mr. Horan applied an 8% capitalization rate to derive an uplands value of $18.75/SF and a tidelands value of $7.50/SF. Mr. Horan testified that 8% is the most common capitalization rate in the Southeast market, although rates go up to 12%. He has

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 19 of 32

only seen a rate of 6% in Petersburg and Sitka, and in both cases that rate was a statutory rate to encourage economic growth rather than a market rate.

40.     Mr. Horan concluded that Ward Cove is in a superior location because it supports two Neo-Panamax cruise ship berths and has significant uplands and surrounding attractions that are being developed for tourism. This sale is an appropriate comparable sale for purposes of valuing the Property and that Mr. Horan's 8% capitalization rate is supported by market data. Accordingly, the Property has an upland value of close to $18.75/SF and a tidelands value of less than $7.50/SF.

41.     Ward Cove was Mr. Bjorn-Roli's comparable L-3. This discussion serves to explain how starting with the same comparable, vastly different market values for the Property resulted and also addresses some of the criticisms leveled at Mr. Horan for using Ward Cove as a comparable.

42.     In his review of Mr. Horan's report, Mr. Bjorn-Roli stated that 8% was an improper capitalization rate.  Mr. Bjorn-Roli used a capitalization rate 6% rate to value this transaction but did not rely on Southeast Alaska market data. Instead, he derived the 6% from Norwegian Cruise Line bond yields and then added a 2% premium.  Norwegian Cruise Lines does not own Ward Cove, but uses the berths for its cruise ships.  Applying this capitalization rate, Mr. Bjorn-Roli arrived at $25/SF for uplands and $10/SF for tidelands.  Applying these per square foot rates computes to $3,099,030 (115148 sq. ft. x $25 + 22,030sq. ft. x $10) for Carlanna's Property.  This is much lower than the $7,500,000 per

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 20 of 32

berth value at Ward Cove which Mr. Bjorn-Roli then transposes as the fair market value of the Property.

43. The problem lies with Mr. Bjorn-Roli's use of a berth as the unit of measure. Mr. Bjorn-Roli uses the total upland square footage value (360,000 sq. ft. x $25 = $9,000,000) and the and the total tidelands square footage value (528,000 sq. ft. x $10 = $5,280,000) adds them up ($9,000,000 + $5,280,000 = $14,280,000) and divides total dollars by two to come up with an adjusted figure of over $7.5 million per berth. This ignores the contract rents were $1.50/SF for uplands and $0.60/SF for tidelands. The uplands have a rental value and are being used for commercial purposes. By using per berth as the unit, Mr. Bjorn-Roli ignores the substantial resources needed to assemble other properties and to allocate a value to their acquisition, as by itself, the Property cannot be developed into one ship berth.

44. Mr. Horan's market value for the Property relies on relevant sales similar to the condemned property, and the sales are within a reasonable proximity in time to the date of valuation.[18] This tribunal finds Mr. Horan to be a credible expert witness.

45. Turning to Carlanna's first market value of the Property for waterfront commercial or industrial use, Carlanna contends that Mr. Wold's appraisals support a value of $7,000,000 by applying a yearly inflation of 3% to Mr. Wold's earlier 2002 and 2010 appraisals. Taking the 2002 $4,100,000 appraisal, and applying a 3% yearly inflation adjustment, would result in a 2021 value of

---

[18] Instruction No. 9 – Comparable Sales

$6,776,675. Performing the same exercise to Mr. Wold's 2010 appraisal of $5,615,000 would result in 2021 value $7,326,301. Therefore, Carlanna posits, a market value of $7,000,000 is reasonable. But this conveniently ignores Mr. Wold's most recent 2021 appraised value of $4,870,000.

46.     Carlanna's use of a 3% adjustment appears to be based on Mr. Wold's 2021 report where he used a 3% annual adjustment to his selected comparable sales. Mr. Wold testified that the 3% adjustment was based on "gut instinct" and on the Consumer Price Index (which only includes Anchorage data).[19] He also testified to two paired sales,[20] but both "pairs" include a 9/24/2021 sale which occurred after Mr. Wold's 4/26/2021 appraisal and is not within the relevant time period. If the 5/16/2011 sale at 4100 Tongass and the 4/9/2001 sale of the AML Land are compared to each other, it shows a decrease of $4/SF from 2001 to 2011. Most telling is Mr. Wold's own valuation of the Property over the years. In 2002 he valued the Property at $4,100,000, in 2010, he valued the property at $5,615,000, and 2021 he valued the property at $4,870,000.     Mr. Wold's own appraisals over the past two decades contradict a linear 3% yearly increment.

47.     Mr. Horan's assessment of the market is consistent with Mr. Elberson's testimony that the Ketchikan real estate market has been "slow and steady" and

---

[19]  Pursuant to Alaska Rules of Evidence 201, this tribunal could take judicial notice of the Consumer Price Index for the US and for Urban Alaska. However, that is not relevant as there is no CPI for rural Alaska, much less one that applies to commercial real estate in Ketchikan.
[20]  Mr. Wold compared: (1) the 5/16/2011 sale at 4100 Tongass for $16.00/SF (Horan Comp. 1) to the 9/24/2021 sale at 994 Stedman Street for $29.50/SF; and (2) the 4/9/2001 sale at 3295 Tongass Ave. for $20.00/SF (Wold L-1) to the same 9/24/2021 sale at 994 Stedman Street.

generally the same in the past 10 years.[21] Several paired sales and listings discussed during the hearing also support finding that the Ketchikan market from 2001 to 2019 was stable and no inflation adjustment should be applied: Mr. Elberson testified that a property near Walmart was listed in 2010 at $1.2 million and sold in 2021 for approximately $1 million; Mr. Horan's Comp. 1, which sold for $462,000 in 2011 had previously sold for only $3,000 less ($459,000) in 2003; and Mr. Wold's L-3, which was listed in 2001 as a 1.514 acre site for $1,320,000 sold in 2015 as a 1.83 acre site for $1,250,000.

48. The contention that a 3% yearly adjustment to Mr. Wold's 2002 and 2010 appraisals for the purpose of arriving at a market value for the Property is unsupported by the evidence and is rejected. [22]

49. Carlanna next contends that Mr. Wold's 2010 appraisal of $5,615,000 as the market value of the Property for waterfront commercial or industrial use should be adopted. Mr. Wold's 2010 appraisal relies on sales between May 2003 and October 2010. These sales are not "a reasonable proximity in time of the sale to the date of valuation."[23] Further, there was no indication at the hearing that Carlanna intended to rely on the 2010 report and there was little discussion on the selection of the comparable sales, or a discussion of the adjustments Mr. Wold made to those sales to arrive at the market value.

---

[21] Mr. Elberson testified he thought the market kept up with inflation, but he did not know what the inflation rate was. I find his testimony the Ketchikan market is stable to be more credible.
[22] It is also doubtful that nationwide the CPI rose by 3% yearly without fluctuations.
[23] Instruction No. 9 – Comparable Sales.

50.    In 2013, real estate agent Mr. Elberson listed the Property for $4,000,000. Five parties expressed interest but no firm offers were received. In 2015, the listing price was increased to $5,615,000 based on Mr. Wold's 2010 appraisal. There were no further inquiries or offers after the price increase. The Property had been listed for sale at $4,000,000 since 2013, and had been on the market since the 1990's without a listing. That it failed to sell at $4,000,000 before any conceivable project influence contradicts factually that the market value of the property is $5,615,000.

51.    Mr. Wold has disavowed his 2019 and 2021 appraisals as not representative of market value with the *caveat* that it is still the market value of the Property for commercial or industrial uses. In fewer words, Carlanna has also disavowed the report by proposing that this tribunal use Mr. Wold's 2010 value instead and find a fair market value of $5,615,000.

52.    This tribunal finds that Carlanna has knowingly waived $4,870,000 as the market value of the Property as stated in Mr. Wold's 2021 report. However, in an excess of caution, should a reviewing court disagree, the validity of Mr. Wold's disowned appraisal will be discussed.

53.    In his 2021 report, Mr. Wold examined eight comparables, L1 – L8, and found six of them L-1, L-4, L-5, L-6, L-7, and L-8 most meaningful.[24]    L-1 is the only waterfront property in in Ketchikan.    L-1 is a 232,818 sq. ft. waterfront

---

[24]  Mr. Wold's L-2 is appropriately excluded because the properties were part of the assemblage necessary to build Berth IV, discussed in earlier in this report. It is not altogether clear why Mr. Wold disregarded L-3, other than it was not comparable to the Property.    L-3 has $25.09 unadjusted per square foot price.

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 24 of 32

property that sold in April 2001. Mr. Wold reported a sale price of $3,200,000 and allocated $20/SF to the uplands.[25] This is not a good comparison as it is two decades old and is stale.[26]

54.    L-4 was the first of the three non-waterfront properties in Ketchikan used by Mr. Wold.  L-4 was a 79,889 square foot corner site that sold for $1,250,000 at $23.30/SF in 2015, and has been developed into the 64-room "MyPlace Hotel". Mr. Wold arrived at a per square foot price of $35.85 by adding $611,445 paid to Marble Construction to perform the site work necessary for the construction of the hotel, resulting in a purchase price of $1,861,445.  There is a creek through the property, requiring the construction of a culvert. Mr. Wold's opined that the site work was necessary to bring the L-4 property up to the same condition as the subject Property.  The $611,445 to do the site work included total cost, overhead and profit for Marble Construction.  Mr. Wold did not venture whether site work would be necessary to build a 64-room hotel on the Carlanna property.

55.    L-6, the second of three non-waterfront properties used by Mr. Wold was comprised of two small lots, totaling 27,156 square feet, within a new subdivision across Tongass Avenue from the Property. It sold for an adjusted price of $520,000 in 2019, with a per square foot price of $19.15.  L-7, the final non-

---

[25] In his Adjustment Grid Exhibit, Mr. Wold listed the sale price was $3,400,000 and $22.47/ sq ft price.  The land was sold for $3,200,000, with another $200,000 added for the demolition costs of the structure on the property.

[26] Mr. Horan reported a sale price of $3,100,000 and allocated $15.08/SF to the uplands

waterfront property, was a 12,886 square foot lot in the same subdivision that sold for $225,000 in 2019 with a per square foot price of $19.15.

56.     All three non-waterfront properties are zoned general commercial. The per square foot prices stated above reflect values before adjustments.[27] To the non-waterfront Ketchikan properties, Mr. Wold made a 100% price adjustment because it is his opinion that waterfront property is twice as valuable as property across the street.[28] When asked, Mr. Wold was unable to identify paired sales to support this adjustment. Mr. Wold's 100% waterfront adjustment is a subjective qualitative adjustment, lacking any factual basis, and is not supported by the evidence.

57.     When Mr. Wold's selected Ketchikan data set is reviewed without adjustments, they fall between $17.46 to $35.85 per square foot. (The outlier, L-4, has been discussed, and if the cost, overhead, and profit of site preparation is excluded, L-4 has a per square foot price of $23.30.) These values are certainly much closer to Mr. Horan's appraisal of $20/SF than to the $40.00/SF advocated by Mr. Wold. Mr. Wold took the actual sale prices and made a gross adjustment of 167.7% to L-4, a gross adjustment of 114.6% to L-6, and a gross adjustment of 133.7% to L-7. As Mr. Wold himself recognized, the greater the percentage of adjustment, the less reliable the adjusted square foot price.

---

[27] Mr. Wold made numerous adjustments, the two most significant are the 3% inflation adjustment and the 100% ocean front adjustment.
[28] This 100% ocean front adjustment to L-4, if accepted, creates a double counting of the $611,445 site preparation costs. The property may be more valuable if it were waterfront property, but cost of site preparation remains the same.

58.    Mr. Wold considered two waterfront properties in Juneau. In a very general manner Mr. Wold opined that Juneau and Ketchikan are the same market. He did not provide any area information for Juneau such as the location, population, government, employment, economy, or provide any detailed data on the Juneau real estate market. In contrast, Mr. Wold provided demographic, economic, employment, industrial, and market trend data for Ketchikan.

59.    Looking at Mr. Wold's 2021 report, two of the three highest unadjusted square foot values are from Juneau, L-5 Gastineau Landing, at $35.09/SF, and Triplette Construction at $35.00/SF. The only higher number is from L-4, the "MyPlace Hotel" in Ketchikan, at $35.85/SF with site preparation costs included. Mr. Wold's 2010 report reveals the same discrepancy: the Ketchikan properties range from an unadjusted price of $27.01/SF - $87.86/SF, and the Juneau properties range from $92.14/SF to $100.00/SF.[29] This tribunal finds that although similar, Juneau and Ketchikan are not in the same relevant market.

60..    Mr. Wold included two Juneau properties: L-5, a 174,821 sq. ft. site that Mr. Wold reported sold for $1,500,000 in April 2017; and L-8, a 131,543 sq. ft. site improved with a two-story industrial building, that Mr. Wold reported sold for $3,320,000 (including the building) on in October 2019. His "location" adjustment to these properties as inferior was due to their street access. Mr. Wold made no adjustment at all for their Juneau location. L-5 included a mixture

---

[29] It is also interesting to note that comparables selected by Mr. Wold in 2010 mostly have a much higher unadjusted price per square foot than his selections in 2019 and 2020.

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 27 of 32

of fee uplands and leased tidelands (both filled and unfilled) which Mr. Wold characterized as a complex and complicated transaction. L-5 and L-8 are not comparable sales to the Property because of their geographic locations, the complicated nature of the L-5 transaction, and the unexplained/unsupported allocation between the land value and the building in the L-8 transaction.

57.     For the reasons stated above, Mr. Wold's 2021 and substantially similar 2019 appraisals are rejected as they do not establish market value for the Property for commercial or industrial use.

**Project Influence**

58.     The parties have slightly different legal interpretations of the project influence rule. Each submitted an Instruction 13, and each party filed a brief supporting their instruction. Both were accepted as correct statements of the law with DOT&PF's version accepted as Instruction 13, and Carlanna's version accepted as Instruction 13A.[30]

59.     DOT&PF's Instruction No. 13 and Chapter 4.8 of the Alaska ROW Manual cite AS 34.60.120(3), which provides that "a decrease or increase in the fair market value of real property before the date of valuation caused by the public improvement for which the property is acquired or by the likelihood that the property would be acquired for the improvement ... will be disregarded in determining the compensation for the property."

60.     Carlanna's Instruction 13A provides additional language that "whenever it becomes likely that the property will be condemned – whether or not the

---

[30] Order dated May 20, 2022.

property was within the project's scope – project enhanced and project diminished value must be disregarded in determining just compensation." Instruction 13A also states that "if the highest and best use of a property is created or destroyed by the likelihood that the property will be condemned for the project, such change in the highest and best use must be disregarded in determining compensation."

61.     In the motion supporting adoption of Instruction 13A, Carlanna appears to argue that the condemnation proceeding changed the highest and best use of the Property, thus reducing its value. This position may have evolved somewhat by the time Carlanna filed its closing argument.  It appears Carlanna wants this tribunal to preclude the DOT&PF from arguing that the Ward Cove project rendered it improbable to develop the Property as a cruise ship berth because the Gravina Access project effectively removed the Property from the market before July 1, 2019, the date the Ward Cove transaction closed.[31]

62.     Addressing the first argument, in *City of Valdez v. 18.99 Acres,* 686 P.2d 682, (Alaska 1984) the city commissioned a study showing that a port project was economically feasible on the property. The issue in *Valdez* is a narrow one, whether the arbitrators could consider the study in its determination of highest and best use and enhance the value of the condemned property.[32] The court ruled in the affirmative.  In *Valdez,* the court ruled that before the condemned property came within the scope of the project, any increase in value is

---

[31]     Compare Motion to Master To Adopt Carlanna's Instruction No. 13 with Carlanna's Proposed Report of Master p.10 fn.45.
[32]     *City of Valdez* at 689

Case 3:20-cv-00306-JWS   Document 51-1   Filed 09/13/22   Page 29 of 32

compensable  However, once the condemned property is within the scope of the project, at the time the government is committed to the project, the property owner is not entitled to any increment in the property value.  In *Valdez,* it was held that the increase in value that resulted from the commissioned study occurred before the condemned property fell within the scope of the project.  In *Orange County Flood Control District v. Sunny Crest Dairy Inc.,* 77 Cal. App. 3d. 742 (Cal. App. 1978) the property owner had previously a nonconforming cash-and-carry operation that was no longer feasible because of the taking.  The court found that it was appropriate to find the highest and best use to be the nonconforming use.

63.     Unlike *Valdez* and *Sunny Crest,* there is no evidence that the Property had been used in any way as a cruise ship dock and that use had then been extinguished.  There were no plans by DOT&PF to use the Property as a cruise ship berth. Neither is there any evidence that there were plans by Mr. Arntzen or any potential buyer to develop a cruise ship dock that were subsequently abandoned because of the Gravina Access Project.  There is no project influence on the highest and best use of the Property.

64.     Carlanna's second argument request that DOT&PF should be precluded from arguing that the 2019 Ward Cove development made it infeasible to use the Property as a cruise ship dock because the Gravina Access Project effectively removed the Property from consideration before July 1, 2019.  Needless to say, there are many reasons discussed above why a cruise ship berth fails as the

highest and best use, and the multitude of reasons do not hinge upon the 2019 Ward Cove development.

65. In his appraisal, Mr. Horan disregarded any project influence on the fair market value of the Property by using comparable sales that were not influenced by the Project. Mr. Wold appears to have addressed project influence the same way, testifying that, to his knowledge, none of his comparables were influenced by the Project. Mr. Bjorn-Roli conceded he has no evidence that the values of Mr. Horan's Comps 1, 2, or 3 were influenced by the Project.[33]   Much as Carlanna would like it to be so, the Property is not in competition for development as a Neo-Panamax ship berth.  Mr. Horan properly disregarded project influence in determining just compensation by using comparable sales that were not influenced by the Project.

## CONCLUSIONS OF LAW

1.      The Instructions to the Master are incorporated herein by reference.

2.      November 6, 2019 is the effective date of taking.

3.      The highest and best use of the Property is waterfront industrial.

---

[33]      Mr. Bjorn-Roli's report opined Mr. Horan's Comp 4 was influenced by the Project because the Property would have been developed instead of Ward Cove if not for the existence of the Project. This opinion is not supported by the evidence nor is it credible.

4.     The total just compensation due to Carlanna is $2,460,000.  The fair market value of the interest in the land taken is $2,415,000 and the value of the improvements, a fence, is $45,000.


DATED this 10th day of June, 2022.

_____

Judge Sen K. Tan, Special Master